**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA
MARTINSBURG**

**RICHARD K. LAMBERT,**

                    Plaintiff,

v.                                          **CIVIL ACTION NO.: 3:16CV00002
                                            (GROH)**

**CAROLYN W. COLVIN,
Acting Commissioner of Social
Security,**

                    Defendant.

## REPORT AND RECOMMENDATION

## I.    INTRODUCTION

On January 5, 2016, Plaintiff Richard K. Lambert ("Plaintiff"), by counsel Monti

VanNostrand, Esq., filed a Complaint in this Court to obtain judicial review of the final

decision of Defendant Carolyn W. Colvin, Acting Commissioner of Social Security

("Commissioner" or "Defendant"), pursuant to Section 205(g) of the Social Security Act,

as amended, 42 U.S.C. § 405(g). (Compl., ECF No. 1). On March 9, 2016, the

Commissioner, by counsel Helen Campbell Altmeyer, Assistant United States Attorney,

filed an answer and the administrative record of the proceedings. (Answer, ECF No. 11;

Admin. R., ECF No. 12). On April 24, 2016, and May 20, 2016, Plaintiff and the

Commissioner filed their respective Motions for Summary Judgment. (Pl.'s Mot. for

Summ. J. ("Pl.'s Mot."), ECF No. 22; Def.'s Mot. for Summ. J. ("Def.'s Mot."), ECF

No. 23). Following review of the motions by the parties and the administrative record,

the undersigned Magistrate Judge now issues this Report and Recommendation to the District Judge.

## II.  PROCEDURAL HISTORY

On May 10, 2012 and May 4, 2012, Plaintiff protectively filed his first application under Title II of the Social Security Act for a period of disability and disability insurance benefits ("DIB") and under Title XVI of the Social Security Act for Supplemental Security Income ("SSI"), alleging disability that began on October 17, 2011.  (R. 235-58).  These claims were initially denied on August 7, 2012, (R. 164-71) and denied again upon reconsideration on December 17, 2012 (R. 187-92).  On January 16, 2013, Plaintiff filed a written request for a hearing (R. 193-94), which was held before United States Administrative Law Judge ("ALJ") Jeffrey P.  LaVicka on June 26, 2014, in Morgantown, West Virginia.  (R. 43-113).  Plaintiff, represented by counsel Montie VanNostrand, Esq., appeared and testified, as did Mary Beth Kopar, an impartial vocational expert. (Id.).  On July 29, 2014, the ALJ issued an unfavorable decision to Plaintiff, finding that he was not disabled within the meaning of the Social Security Act.  (R. 27-42).  On September 3, 2015, the Appeals Council denied Plaintiff's request for review, making the ALJ's decision the final decision of the Commissioner. (R. 6-11).

## III.  BACKGROUND

### A.  Personal History

Plaintiff was born on April 28, 1972, and was 40 years old at the time he filed his first SSI claim.  (R. 235, 251).  He completed high school and a year of vocational training (R. 55).  Plaintiff's prior work experience included stacking lumber and truck

driving. (R. 57, 59, 360). He is married and resides with his wife and four children. (R. 51). Plaintiff alleges disability based on chronic lower back pain, bilateral knee osteoarthritis, arthritis of both thumbs, morbid obesity, chronic obstructive asthma, obstructive sleep apnea, cardiac problems, chronic fatigue, mixed dyslipidemia, chronic edema, arrhythmia, gastric reflux, large umbilical hernia, hypertension with proteinuria in the urine, depression, anxiety and avoidant personality disorder. (R. 47-49).

## B.    Relevant Medical Evidence

### 1.  Medical History Pre-Dating Alleged Onset Date of October 17, 2011

On February 29, 1979, Plaintiff was admitted into Davis Memorial Hospital to determine the cause(s) of his obesity, none of which were noted in his medical records. (R. 501). During his early childhood he returned to the hospital on a number of occasions for treatment of "bronchial asthma and croup" and "periodic acute laryngotracheobronchitis." (R. 492, 498). In his early and mid-twenties, Plaintiff revisited Davis Memorial Hospital complaining respectively of pain in his back, left wrist, right hand and thumb, and left shoulder (R. 465-68).

On July 9, 1996, Plaintiff reported to Davis Memorial Hospital Emergency Department, complaining of left shoulder pain and explaining he injured his left shoulder while stacking lumber the previous day. (R. 464.) Dr. Charles Kirland, determined the pain Plaintiff was experiencing was "probably tendonitis vs. bursitis." Id. Plaintiff was dischared , prescribed Naprosyn and instructed to ice and then heat the area. Id.

On March 26, 1999, Plaintiff presented to Davis Memorial Hospital complaining of abdominal pain, nausea, feeling feverish and chills. (R. 545-54.) X-rays revealed a borderline sized heart. He was diagnosed with having dehydration and cellulitis of the

right lower extremity.  (R. 547).  Plaintiff was discharged and instructed to elevate feet and proceed with "diet and activity as tolerated," Id.  Keflex and Triam were prescribed. Id.

On September 29, 2000, Plaintiff reported to the emergency department at Davis Memorial Hospital complaining of his inability to use his left shoulder. R. 535.  An x-ray results showed no fracture or dislocation.  R. 537.

Plaintiff has had a history of recurrent urethral strictures.  Over a span of seven years, beginning on February 11, 2002 until April 14, 2009, Plaintiff had a number of urethral stricture operations to absolve its narrowing.  (R. 528, 566, 617, 623, 640, 650, 1158).  It was noted Plaintiff left the operating room in good condition on each occasion. Id.

On January 27, 2003, Plaintiff presented to Davis Memorial Hospital for examination.  (R. 576).  Plaintiff's lungs were well inflated and generally clear, and his heart was determined to be in the upper limits of normal.  (R. 576.) It was determined that no acute cardiopulmonary abnormality was found.  Id.

On November 22, 2005, Plaintiff reported to Davis Memorial Hospital complaining of chest pressure.  A chest x-ray showed borderline cardiomegaly.  (R. 631).  Edema was noted in his lower extremities with some reddening of the lateral lower legs.  Id.  His discharge diagnosis included: supraventricular tachycardia ("SVT") "with trivial elevation of his cardiac enzymes now resolved, dyslipidemia with high triglyceride and morbid obesity." (R. 632).  Recommends Omega-3 fatty acid.  Id.

From January 18, 2007, to December 17, 2007, Plaintiff presented to Harris Family Chiropractic on a monthly basis, on average, complaining of achy pain and

tightness and stiffness in his lower back. (R. 718-23, 769-75). During this period, he was diagnosed with lumbar and sacral segmental joint dysfunction. Id. Restrictions were palpated in the following joints: right S1, L4/L5 and L2. Id. Plaintiff reported improvement with treatment, and indicated he is able to perform most activities of daily living with little to no difficulty. Id.

On March 3, 2008, Plaintiff returned to Harris Family Chiropractic for evaluation. (R. 718). Plaintiff complained of pain and stiffness in his lower back and explained the pain has gradually been getting worse. (R. 717.) Restrictions were palpated in the following joints: right S1, L4/L5 and L2. Id. Plaintiff's diagnosis included lumbar and sacral segmental joint dysfunction and mild lumbar spine sprain/strain. Id. Plaintiff received "myofascial trigger point therapy to the spine and chiropractic manipulative therapy activator to the reported restrictions." Id.

On November 28, 2007, December 1, 2008, December 17, 2010, and January 30, 2012, Plaintiff visited North Central Cardiology Associates for follow-up and evaluation of supraventricular tachycardia, hypercholesterolemia and valvular disease. (R. 747-51). At each visit, Plaintiff had no cardiac, respiratory, or psychiatric problems; muscle strength and tone were normal but During the November 2007 visit, Plaintiff reported having an umbilical hernia and polyps in the urethra. Id. Plaintiff's diabetes, cholesterol, and palpitations or tachycaridas showed improvement and stability. (R 748, 850, 752) Plaintiff remained morbidly obese and has not had any significant weight loss although weight loss was strongly encouraged. (R. 752). Medication was not changed. Id.

On January 29, 2009, Plaintiff presented to Tygart Valley Orthopedics & Sports Medicine complaining of numbness in both of his hands and emphasizing his left hand was much worse than the right. (R. 1222). Plaintiff reported having some mild decrease in his grip strength and occasionally dropping objects. Id. He further reported having thumb and wrist pain. He was diagnosed with carpal tunnel syndrome, given an anti-inflammatory, and given a splint to wear on his left hand at nighttime. Id. Plaintiff was referred for "bilateral upper extremity EMG, nerve conduction studies, which confirmed advanced carpal tunnel syndrome. (R. 1164, 1221, 1222).

On March 5, 2009, Plaintiff was given a cortisone injection and agreed to proceed with carpal tunnel surgery. Id. Four days later, carpal tunnel surgery was performed on Plaintiff's left hand; he was discharged in good condition. (R. 1220). At his March 23, 2009, postoperative appointment, Plaintiff stated that his nighttime symptoms had completely resolved and he had no other complaints. (R. 1219). Furthermore, it was noted that he had a normal neurovascular examination. Id. During his April 22, 2009, appointment, Plaintiff stated that the pain was totally resolved and had no complaints other than some decrease in his grip strength. (R. 1218).

From April 27, 2009, to May 14, 2009, Plaintiff presented to Elkins Physical Therapy & Sports Injury Clinic several times for treatment following his left carpal tunnel surgery. (R. 1234-43). On May 14, 2009, Plaintiff reported no pain in his left wrist and was discharged to return to work. (R. 1234).

On June 12, 2009, Plaintiff was diagnosed of having obstructive sleep apnea. (R. 192.) Plaintiff had two sleep studies performed: on August 26, 2009, and August 28, 2009. (R. 680, 690). Plaintiff experienced four obstructive apneas and seven

hypopneas during both studies. (R. 680, 690). During the first study, the apneas and hypopneas were almost completely eliminated using the nasal CPAP/BiPAP. Id.

In 2009, Plaintiff presented to Central WV Medcorp for evaluation and treatment. (R. 792-869). In March and May, Plaintiff's diabetic ulcer in his lower left leg was evaluated. (R. 794). His right lower leg was evaluated in July. In August, he was evaluated for diarrhea. (R. 800-03). Review of cardiovascular, respiratory, musculoskeletal, and gastrointestinal systems were negative to pain and to bone/joint symptoms and weakness. (R. 792-801). He presented with an upper respiratory infection and knee pain, respectively, on two separate visits in November, and a rash and pain in his right lower leg, respectively, during two separate visits in December. (806-15). Generally, the respiratory, cardiovascular, musculoskeletal and gastrointestinal systems showed no irregularities and were normal to inspection, except for some symptoms of coughing and nasal congestion during his November 11th visit and knee tenderness during his November 17th visit (R. 806-16). During his December 5th visit, Plaintiff's entire right leg presented with some degree of redness and swelling. (R. 816). However, his respiratory, cardiovascular and integumentary systems appeared normal to inspection. Id. Ultram, Levaquin, Bactroban, Dolgic Plus, and Vistaril were prescribed.

On November 20, 2009, Dr. Topping determined Plaintiff's right knee demonstrated "mild to moderate osteoarthritis of the patellofemoral joint." (R. 1217). After being explained his option of continuing with conservative treatment versus injections, Plaintiff opted for the injections. (R. 1215). Plaintiff was informed of his option of discussing knee arthroscopy in the future if his problems persisted. Id.

On March 1, 2010, Plaintiff had surgery in his right hand to treat his carpal tunnel syndrome. ( R. 1213).  Patient left the procedure room in good condition.  Id.  On March 16, 2010, Plaintiff returned to Tygart Valley Orthopedics & Sports Medicine for a postoperative appointment of his right carpal tunnel surgery.  (R. 1211).  Plaintiff indicated that his numbness and tingling had completely resolved.  Id.  He was released with physical therapy instructions.  Id.

From March 24, 2010 to April 19, 2010, Plaintiff presented to Elkins Physical Therapy & Sports Injury Clinic several times for treatment following his right carpal tunnel surgery.  (R. 1229-33).  During his April 19th visit, Plaintiff presented with normal range and strength in his right wrist, with the doctor noting that his grip would become stronger through daily activity.  (R. 1229).  Plaintiff was released to go back to work on April 21, 2010.  Id.

Plaintiff returned to Central WV Medcorp in 2010, six times.  (R. 824-833).  He presented with an upper respiratory system infection on March 1st, March 30th, and October 14th.  (R. 818, 827, 832).  During those visits, Plaintiff's cardiovascular, gastrointestinal and neurological systems showed no irregularities and were normal to inspection.  Id.  Although his symptoms included coughing, no serious respiratory problems were reported.  (R. 819, 828, 831).  Plaintiff presented with a rash on his back and arms on April 11th and on his abdomen on May 24th.  (R. 821, 824).  His respiratory, cardiovascular, gastrointestinal and neurological systems showed no irregularities and were normal to inspection.  (R.822, 825).  A few medications were renewed.  (R. 826).  His last 2010 visit was for cold symptoms.

On May 17, 2010, Plaintiff returned to Harris Family Chiropractic, complaining of a worse degree of mid-back pain, and development of pain in his upper back around his right shoulder blade. (R. 777). Functional motion was checked and moderate loss of joint function at T4 and T7 were noted. Id. On September 9, 2010, his levels of pain increased on the right side of his neck and right shoulder. (R. 778.) A moderate loss of joint function was reported at C1, C2 and C5. Id.

From August 16, 2011, through April 26, 2012, Plaintiff presented to Central WV Medcorp several times, complaining of cold symptoms, cellulitis and fluid retention, respectively. (R. 837-74). During Plaintiff's August 16, 2011 visit, the fold in Plaintiff's abdomen was red and he refused an ER evaluation. (R. 837) However, the following day, he stated the symptoms improved. (R. 839). On his October 13, 2011, visit, the area of redness on the pannus measured 6.0 by 9.0 cm. (R. 844). The injury is associated with fever and localized swelling, but Plaintiff denied abdominal pain, chills, fatigue, joint pain nausea or rash. (R. 844). Plaintiff consented to an ER evaluation. (R. 845).

On August 20, 2011, Plaintiff presented to Elkins Express Care, primarily seeking a second opinion about his cellulitis. (R. 738). Plaintiff explained that the area had gotten much better. Id. Plaintiff was seen by physician assistant Cris Rivera, who after a complete examination of Plaintiff, diagnosed him with Cellulitis nos. Id. On this date he showed no cardiorespiratory distress, no significant pain was noted, and lungs were clear. (R. 739.) Plaintiff was given Rocephin, prescribed DEMADEX and Zithromax and was then released. (R. 740).

Plaintiff reported to Davis Memorial Hospital on September 29, 2011, complaining of leg swelling. (R. 992). Diagnosis included venous hypertension with inflammation, morbid obesity, type II diabetes and hypothyroidism. Id. Plaintiff was prescribed compression stockings. (R. 993). Dr. Chua noted discontinuing the Diligiazam stating that it can exacerbate leg welling. Id.

### 2. Medical History Post-Dating Alleged Onset Date of October 17, 2011

On October 31, 2011, Plaintiff was seen by Dr. Phillip Chua for follow-up of cellulitis of the abdomen, which showed slight improvement form his hospitalization (he didn't have fevers but redness and swelling persisted). (R. 971). Over the next several months Plaintiff presented to Dr. Chua for follow-up. (R. 970-994). By November 23, 2011, Plaintiff no longer had cellulitis or any other problems. Review of his systems were all negative. (R. 973). His cellulitis resurfaced, but got better after treatment with antibiotics. Id.

Starting from October 2011 until May 2012, Plaintiff presented to the emergency room at Davis Memorial Hospital, with a hospital stay spanning from one to three days. (R. 876-969). Plaintiff was seen for cellulitis of the abdomen. Various prescriptions were given, and Plaintiff showed improvement over time. Id. Medical notes from his May 30, 2012, visit diagnosed Plaintiff with panniculitis of the lower abdomen, type II diabetes uncontrolled, history of hypertension, morbid obesity, and obstructive sleep apena. (R. 1061). Avelox and vancomycin were noted to have contributed to the fading of the redness on Plaintiff's abdomen. Id. Further, it was noted that Plaintiff could return to work. Id.

On January 30, 2012, Plaintiff presented to North Central Cardiology Associates, for follow-up of hypercholesterolemia and valvular disease. (R. 766). Patient had no complaints, no respiratory, cardiac or psychiatric problems, but complained of joint pain and headaches. Id.

On April 17, 2012 and April 26, 2012, Plaintiff presented to Central WV Medcorp., reporting cellulitis, which was found to be mild to moderate, respectively. (R. 862, 872). The cellulitis improved and then worsened. (R. 862, 864, 872). Treatment consisted of antibiotics. (R. 872). The respiratory, cardiovascular, and neurological systems showed no irregularities. (R. 863, 865, 873). Medication included Keflex, and significant weight loss was recommended. (R. 874).

From July 2, 2012, to November 15, 2012, Plaintiff presented to Dr. Chuas' office for evaluation of his health. (R.1244-54). His systems were good, although his history of panniculitis and intermittent diarrhea were noted. (R. 1253)

On August 2, 2012, Plaintiff was seen in the office of Dr. Salam Rajoub, where he had a pulmonary function test completed. (R. 1269). Plaintiff was diagnosed with moderate to severe asthma which is being monitored and controlled. Id.

Plaintiff returned to chiropractor, Scott Harris for chiropractic treatment on September 28, 2012, and October 2, 2012. During his September visit, he indicated that the severity of the pain in his mid and lower back had increased. (R. 1178). He was unable to "lie prone due to a hernia." Id. He tolerated treatment well. Id. Four days later he reported modest improvement with pain in his lower and mid-back. (R. 1177). Again, he tolerated procedures well and was instructed to return as needed. Id.

Plaintiff presented to Tygart Valley Orthopedics & Sports Medicine three times in October of 2012, for evaluation of his bilateral hip and knee pain. (R. 1205-1208). X-rays were obtained and reviewed by Dr. Richard Topping, who assessed Plaintiff to have "bilateral knee mild DJD predominantly affecting the patellofemoral joints," and "bilateral hip trochanteric bursitis." (R.1205, 1208). Plaintiff had the option of continuing with conservative treatment, by using anti-inflammatories with physical therapy versus receiving injection therapy. Id. Plaintiff opted out of the cortisone injection. Id. Plaintiff was referred to "Dr. Bob Barid's office for a functional capacity evaluation (FCE)." Id. When Plaintiff informed Dr. Topping that he was considering filling for disability, Dr. Topping opined, "with a reasonable degree of medical certainty that Plaintiff's hand condition would prevent him from doing high-volume repetitive motion work with both hands." (R. 1207).

From January 3, 2013, to April 29, 2013, Plaintiff returned to Dr. Chua's office for follow up of type II diabetes mellitus and cellulitis. (R. 1278, 1292, 1298). Results from a review of all his systems were negative Id. Plaintiff was diagnosed with hypertension benign, type II diabetes, mixed hyperlipidemia and cellulitis. Id.

Plaintiff had additional sleep studies performed on September 27, 2012, and July 24, 2013. (R. 1303-18). The studies involved using a CPAP/BIPAP machine to treat obstructively sleep apnea. Id. Plaintiff responded well to the CPAP machine (R. 1310, 1311). Plaintiff's July 31, 2013, and August 15, 2013, medical records from Central WV Medcorp note that Plaintiff's sleep apnea has been resolved. (R. 1335-36).

On June 16, 2013, Plaintiff presented to North Central Cardiology Associates, complaining of a recurrence of cellulitis under his abdominal folds. (R. 1326). He

denied any abdominal pain, change in appetite, chills diarrhea, fatigue, fever, headache, localized swelling, malaise, nausea, rash or vomiting.  Id.  Review of all systems were negative.  Id.

On July 24, 2013, Plaintiff had a follow up visit at North Central Cardiology Associates.  (R. 1333).  Plaintiff reported feeling well overall.  Id.  He had no chest pain, shortness of breath, syncope, or near syncope, no gastrointestinal complaints, and no edema.  Id.  Palpitations were noted to be resolved.  (R. 1334).  Plaintiff had gained twelve pounds since his last visit, weighing over 414 pounds.  (R. 1333).  He and doctor discussed, at length, diet and lifestyle modifications, including weight loss.  Id.  No changes to Plaintiff's medications were made.  Id.

Plaintiff returned to Davis Medical Center on March 14, 2014, March 20, 2014, and April 11, 2014, for a routine follow-up of chronic conditions.  (R. 1408, 1414, 1426).  A review of his systems returned negative for the cardiovascular, gastrointestinal, genitourinary, metabolic/endocrine, dermatological and hematology.  Positive results included: pain, cough, dyspnea, wheezing, headache, back and joint pain and seasonal allergies.  (R. 1408-19).  Plaintiff indicated that his asthma symptoms persisted and occurs intermittently.  (R. 1426).  His dosage of Adavair was increased.  (R. 1429).

**Medical Reports/Opinions**

**a.  Functional Capacity Evaluation and Report**

On November 6, 2012, John DiBacco, PT, DPT, a physical therapist at Elkins Physical Therapy and Sports Injury Clinic, completed a functional capacity evaluation (FCE) assessment of Plaintiff, summarizing Plaintiff's medical history and determining Plaintiff is capable of performing light lifting with significant restrictions on his ability to

perform lifting from floor height and from twelve inches above floor height at the frequent and constant frequency. (R. 1329- 31). On the occasional material handling (3-33% of the work day) portion of the testing, Mr. DiBacco determined Plaintiff is able to handle weights in the fifteen to thirty pound range. (R. 1330). For the frequent material handling (34-66% of the work day) portion, Plaintiff is able to handle weights in the eleven to fourteen pound range. Id. For the constant material handling (67-100% of the work day), Plaintiff is able to handle weights in the five to seven pound range. Id. Plaintiff would be able to perform bending and squatting on an occasional basis, stair climbing on an infrequent basis, and forward reaching on a constant basis. (R. 1330-31). Overhead reaching can be performed on a constant basis if the back is held in a neutral position. (R. 1331). Plaintiff's sitting is limited to thirty minutes of prolonged positioning, while standing and walking are best tolerated on an infrequent basis of fifteen minutes of prolonged activity. (R. 1330). He would not be able to tolerate kneeling, crawling, or ladder climbing. Id. Plaintiff demonstrated good balance skills on level ground but may have some difficulty on sharp inclines or uneven ground. (R 1331). Mr. DiBacco found Plaintiff would be able to operate light arm controls with either arms and light leg controls within his sitting restrictions. Id. He also concluded Plaintiff shows significant restrictions on his ability to tolerate prolonged sitting or standing, which would have significant impact on his ability to tolerate both driving and sedentary type of work, and could qualify him as being unable to work. Id.

Mr. DiBacco completed an additional functional capacity evaluation (FCE) of Plaintiff on May 22, 2014. Plaintiff reported that since his last FCE he has been diagnosed with "COPD" and has developed neuropathy symptoms in both feet. (R.

1401).  Plaintiff expressed he continues to have many of the same musculoskeletal problems with osteoarthritis, pain, limited motion in both thumbs and knees, bursitis, chronic pain in the left hip, and continued episodes of cellulitis along the bottom of his stomach.  (R. 1401).  Plaintiff reported having a history of carpal tunnel syndrome in both wrists, a hernia along the central abdomen and pain throughout his back.  Id.

On the occasional material handling (3-33% of the work day) portion of testing, Plaintiff was able to lift weights ranging from five to ten pounds.  (R. 1402).  Plaintiff was not able to lift any weight when weight was placed at floor heights or one foot above the floor.  Id.  He could lift ten pounds over a three foot wall, from waist height to shoulder height, but was unable to lift any weight from shoulder height to overhead.  Plaintiff experienced shortness of breath very easily with light exertion throughout the occasional material handling testing.  (R. 1402).  During frequent material handling testing (34-66% of the work day), Plaintiff was able to lift weight in a range of four to seven pounds.  Id.  For constant material handling (67-100%) of the work day, it was determined Plaintiff would be able to handle weight in the range of two-three pounds for the carrying and the push/pull tasks.  Id.  For non material handling tasks, Mr. DiBacco determined Plaintiff would be able to perform squatting bending, and stair climbing on an infrequent basis, but would be unable to perform kneeling, ladder climbing, or crawling.  Id.  Sitting is limited to thirty minutes of prolonged positioning, while standing and walking are limited to fifteen minutes of prolonged activity.  Id.  Both forward and overhead reaching could be performed on an occasional basis.  (R. 1403).  Mr. DiBacco opined that Plaintiff is not able to work at this time, noting his material handling and non-

material handling were limited to sedentary work, and noting his cellulitis, back, hip and knee pain leave him unable to tolerate work involving prolonged sitting.  (R. 1403).

### b.  Consultative Examination Report

On July 26, 2012, Dr. Arturo Sabio, completed a consultative examination report on Plaintiff.  (R. 116-20).  Dr. Sabio indicated that Plaintiff's chief complaint was his chronic cellulitis, palpitations, acid reflux, hypothyroidism, diabetes mellitus, asthma, and morbid obesity.  (R. 1116).  Dr. Sabio's diagnostic impressions were (1) hypertension, uncontrolled, (2) diabetes mellitus type II, (3) history of sleep apnea, (4) bronchial asthma, (5) morbid obesity, (6) umbilical hernia, and (7) degenerative arthritis. (R. 1119).  Dr. Sabio noted Plaintiff is morbidly obese, which makes it difficult for him to ambulate.  Id.  His lower extremities had edema, but no redness or ulcers.  Id.  His gait was normal and he did not require any ambulatory aids.  Id.  Plaintiff had an elevated blood pressure and he complained of shortness of breath, but on examination his breathing was "effortless".  Id.  Dr. Sabio also noted that Plaintiff has a 4 x 4 inch umbilical hernia that is reducible and nontender. Id.

### c.  Psychiatric Evaluation, Addendum, Mental RFC

On April 28, 2014, Robert Klein Ed.D, completed a mental residual functional capacity assessment of Plaintiff's work-related abilities and a psychological evaluation of Plaintiff.  (R. 1371-84).  Dr. Klein found that across the functional and adaptive domains, Plaintiff had a number of moderate to marked limitations.  (R. 1380-84).  Dr. Kelin referred to the psychological evaluation he completed of Plaintiff several times on Plaintiff's mental RFC form.  In Plaintiff's psychological evaluation, Dr. Klein noted there was no suggestion Plaintiff had suicidal thoughts and his immediate memory appeared

to be normal while recent memory indicated moderate deficiency. (R.1372). His concentration was within normal limits and his persistence was stable. Psychomotor behavior suggested a sense of physical discomfort. Id. Testing indicated Plaintiff had severe depression and anxiety. Specifically, Plaintiff was diagnosed with Major Depressive Disorder, Anxiety Disorder, Avoidant Personality Disorder, Obesity, Diabetes, Asthma, Heart Condition, GERD, Cellulitis, Mental and Physical impairments and serious impairment with Global Assessment of Functioning. (R. 1374).

### d. Primary Care Physician Questionnaire

Dr. Catherine Chua completed a Primary Care Physician Questionnaire on April 12, 2014, indicating that she last examined Plaintiff on April 11, 2014. (R. 1360-67). She noted his past relevant medical history included: obese male with a history of uncontrolled diabetes, hypertension, hyperlipidemia, hypothyroidism and edema. (R. 1360). Plaintiff was diagnosed with uncontrolled diabetes, chronic obstructive asthma, mixed hyperlipidemia, obesity, vitamin deficiency, hypothyroidism, and hypertension. Id. She found Plaintiff's impairments to include: diabetes mellitus Type II, hypertension, mixed hyperlipidemia, vitamin D deficiency, hypothyroidism, asthma, obstructive sleep apnea syndrome, osteoarthritis, chronic low back pain, edema and gasteoesophageal reflux disease (GERD).[1] (R. 1361). She noted Plaintiff's cellulitis has been resolved. Id. Additionally, considering Plaintiff's medical impairments, Dr. Chua recommended Plaintiff engage in a light level of activity for an 8 hour day, which includes "[a] significant amount of walking and standing lifting 10 pounds frequently and up to 20 pounds occasionally, or sitting most of the time pushing and pulling." (R. 1362). She also believed he needed a sit/stand option in order to vary positions, and it was

---

[1] During Plaintiff's May 20, 2014, visit, DR. Chua noted Plaintiff's GERD was resolved. (R. 1399).

advisable for Plaintiff to occasionally recline or lie down at times during the day with his feet up. (R. 1362-63). She noted Plaintiff had no need for an ambulatory aid, and opined that Plaintiff was not capable of working a full time job. (R. 1364, 67).

## C. Testimonial Evidence

At the ALJ hearing held on June 26, 2014, Plaintiff divulged his relevant, personal, work-related facts. Plaintiff was born on April 28, 1972, and was forty-two (42) years old at the time of the administrative hearing. (R. 50). He is 5'6" tall and his weight between 405 and 410 pounds. Id. He is married, lives with his spouse, twenty-year-old daughter and eighteen, seventeen and fifteen-year-old sons. (R. 51).

Plaintiff testified regarding his education and work-experience. He stated that he graduated from high school, completed a year of vocational training in industrial maintenance and obtained his CDLs. (R. 55-56). Plaintiff's employment history includes working at Southern Western Virginia Asphalt. (R. 57). While Plaintiff alleges disability as of October 17, 2011, he explained he attempted to return to work in March 2012, and worked on and off as a truck driver from 1999 until June 2012. (R. 58-59).

Plaintiff testified that he suffers from several impairments, including knee, hip and back pain. (R. 60, 68). He stated that he has arthritis in his knees and hip, osteoarthritis, bursitis, and suffers from depression and chronic obstructive pulmonary disease (COPD). (R. 60-61, 69). He has cellulitis and diabetic ulcers. (R. 81-82). Plaintiff has undergone surgery for carpal tunnel and to repair his urethra. (R. 61). Furthermore, he is prescribed multiple medications to treat his diabetes, cholesterol, asthma and COPD, including Metformin, Glyburide Victoza Furosemide, Spiriva, Advair, Albuterol and Corazon (R. 62-63). Plaintiff stated some of the medications cause

diarrhea and have multiple other side effects, but was unable to remember all of them. (R. 63).

Plaintiff described how his impairments affect his day-to day life. He stated his daughter or wife help him dress and wash under his stomach. Id. He is able to stand for an extended period of time if he leans against something. (R. 69). He is unable to stand up straight for "any longer than 10-15 minutes at a time. Id. He is unable to sit up straight in a "regular chair" for more than ten to fifteen percent of a work day, otherwise his hip and knees hurt and his legs swell. (R. 86, 87). He is unable to grip things as a result of pain in his thumb and numbness in his fingers. (R. 71).

Plaintiff testified that he has asthma and "can hardly breathe at all when it's humid out." (R. 75, 76). He testified that in a normal day, because of his asthma and lower back pain, he is only able to stand one to two percent of the day and walk two to five percent of the day. (R. 91).

Plaintiff testified that he has difficulty concentrating and doing mental activities. (R. 93). He explained that he forgets things and has "an extremely short fuse." (R. 93).

Plaintiff testified that he sleeps well at night. (R. 88). Extra pillows help him to sleep more comfortable. (R. 89). However he cannot lie on his stomach because "it hurts [his] hernia. (R. 90). Plaintiff stated that he cannot lift or bend over because doing so hurts his back and hernia. Id.

Plaintiff testified that he gets diarrhea after he eats, but that he has a small appetite. (R. 95). He stated that he does not have any wide fluctuations in his weight even when he takes pills to address the fluid build-up in his body. Id. Plaintiff further testified that he urinates every twenty to thirty minutes. Id.

Plaintiff testified that his Vitamin D deficiency has improved with treatment, and the "racing" palpitations and chest pain he has been experiencing has improved after using the CPAP machine. (R. 78). Plaintiff further testified he drives once or twice a week to transport his son from work. (R. 54). He denied talking on his cell phone, cooking, going shopping, washing dishes, doing laundry, making beds, sweeping the floor, vacuuming, doing yard work, and using the computer. (R. 65).

## D.    Vocational Evidence

Also testifying at the hearing was Mary Beth Kopar a vocational expert (VE). Ms. Kopar testified that Plaintiff's past work as a dump truck driver was characterized by the DOT as unskilled, but that Plaintiff performed more at semi-skilled. (R. 98). She further characterized Plaintiff's past work of a delivery driver as semi-skilled. Id. With regards to Plaintiff's ability to return to his prior work, the ALJ then posed the following hypothetical to Ms. Kopar:

> Q:    [A]ssuming a hypothetical individual with the same age, education, and work experience as the claimant, who retains the capacity to perform sedentary work with allowance to alternate sitting or standing positions for up to two minutes at 15 minute intervals without going off task; is limited to occasional overhead reaching bilaterally; who is limited to occasional overhead reaching bilaterally; who is limited to frequent handling and fingering bilaterally; must avoid concentrated exposure to extreme cold and heat; concentrated exposure to wetness and humidity; concentrated exposure to excessive vibration; concentrated exposure to irritants and chemicals; all exposure to unprotected heights, hazardous machinery and commercial driving; whose work site must be located within100 feet of a restroom; whose work is limited to no fast-paced production requirements and few workplace changes; must have only occasional interaction with the public, co-workers, and supervisors. [S]uch an individual would be incapable of performing the past work of the claimant; is that correct?

Ms. Kopar testified that such a person could not, but could do the following three occupations: (1) laminator; (2) addresser; and (3) masker (R. 99). Ms. Kopar further

added that 15% of time is allowed to be off task and that a person could miss up to one day per month.  (R. 100).

Ms.  Kopar testified that her testimony was consistent with the Dictionary of Occupational Titles.  Id.

Next, Plaintiff's attorney questioned Ms.  Kopar regarding Plaintiff's ability to perform other work with sedentary exertional parameters; various sitting, standing, and walking limitations; and various work breaks (R. 101-07).  Ms.  Kopar noted that a hypothetical person that had to walk away from the work station putting them off task greater than 15 percent would be precluded from employment.  (R. 107).

**E.      Report of Contact Forms, Work History Reports & Disability Reports**

On May 20, 2012, Plaintiff completed a work history report.  (R. 358).  In the report, Plaintiff indicated that he had worked as a truck driver for West Virginia Paving from September 1999 to May 2012.  (R. 358).  Plaintiff described the duties of this position as driving a dump truck and hauling black top stone from the quarry to various destinations.  (R. 359).  Plaintiff stated that the position did not require any lifting, but required two hours of walking, two hours of standing and eleven to fourteen hours of sitting, daily.  (R. 359).  Plaintiff further indicated that he worked as a truck driver for a trucking company.  (R. 358, 360).  Plaintiff stated that the position required him to lift less than ten pounds, frequently, and to stand for one to two hours; walk one to three hours; handle, grab or grasp big objects four to eight hours; reach four to six hours climb, one to one and a half hours; and sit ten hours daily.  (R. 360).  Lastly, Plaintiff indicated he worked as a laborer for Coastal Lumber Company.  (R. 361).  Plaintiff stated that the position required him to frequently lift ten pounds and to walk ten to

twelve hours, stand ten to twelve hours, kneel one to three hours, sit at least one hour, and reach, handle, grab or grasp big objects ten to twelve hours daily. (R. 361).

Report of Contact forms were completed in May and June of 2012 by the Social Security office in Elkins, West Virginia. The May reports noted Plaintiff worked May 15th – 17th but discontinued working because his cellulitis worsened. (R. 356). The June report noted Plaintiff was still working. (R. 376).

On May 11, 2012, plaintiff completed a Disability Report. (R. 343-53). He indicated that the medical conditions impacting his ability to work consisted of (1) chronic cellulitis, (2) heart palpitations, (3) acid reflux, (4) hyperthyroid[ism], (5) diabetes, (6) asthma, (7) edema and (8) morbid obesity. (R. 344). He noted that he stopped working on April 30, 2012, because of "[his] conditions." (R. 344).

Plaintiff submitted two Disability Report-Appeal forms, both undated. On the first form, Plaintiff reported a change in his condition. (R. 383). Specifically, Plaintiff reported the "arthritis and deterioration in [his] thumbs worsened, [explaining] he [could] not hold anything for more than a few minutes." (R. 383). On the second form, Plaintiff reported his breathing problems got measurably worse in January 2013. (R. 401). Plaintiff further stated that he had a functional capacity evaluation completed and was told that he was unable to work. (R. 401).

## F.    Lifestyle Evidence

On an adult function report dated May 20, 2012, Plaintiff states he suffers from cellulitis and lower back, knee and thumb pain. (R. 367-68, 370, 374). He describes his typical day as waking up, feeding the pets, going to work, returning home, eating dinner and going to bed. (R. 368).

Plaintiff explains how he is physically limited in some ways but not in others. Plaintiff performs his own personal care. (R. 368). He is able to perform various household chores, including some household repairs, laundry and little cooking. (R. 369). His wife does most of the cooking and he receives assistance from his son with household repairs. Id.

While Plaintiff is able to perform some activities, others prove more difficult. For example, Plaintiff can no longer perform certain hobbies, such as hunting and fishing, (R. 371). He socializes with others four to six times a month and attends church weekly. (R. 371). He is able to walk no more than half a mile before stopping and resting, although he is able to resume walking after a ten to twenty minute break. (R. 372).

As for his mental abilities, Plaintiff states that he is able to follow written and spoken instructions, handles stress, is able to adjust to changes and is able to pay attention "all the time." (R. 372-73).

On a second adult function report dated November 30, 2012, Plaintiff states that he suffers from pain in his lower back, osteoarthritis in his thumbs and knees, bursitis in his hips, and cellulitis. Plaintiff states that his pain is so severe that he cannot stand for extended periods of time, sit for long or drive professionally. (R. 393). He describes his typical morning as obtaining assistance from his wife with washing up, and reclining most of the day, with the exception of taking his daughter to and from work. (R. 394). He states he can no longer sleep on his left hip due to the bursitis and wakes up with extreme pain and stiffness in his back. (R. 394). He currently takes Furosemide and

Metoalzone, which causes him to have to go to the restroom every twenty to thirty minutes. (R. 400).

Plaintiff explains some physical limitations. For example, Plaintiff obtains assistance with dressing, bathing, shaving, and using the toilet. (R. 394). Plaintiff is able to wash dishes and fold laundry, but is unable to do any yard work or housecleaning. (R. 395-96). He has no issues with handling money and is able to pay bills, count change, and use a checkbook. (R. 936). Plaintiff is able to drive and ride in a car. Id.

Plaintiff reiterated that he no longer can go fishing or hunting. (R. 397). He further stated that he can no longer attend church because of the difficulty he has standing during singing and worship. Id. He has been prescribed and uses a wrist brace/splint. (R. 399). Plaintiff is able to walk 100-150 feet before stopping and resting, but is able to resume walking after a ten to fifteen minute break. (R. 398).

Regarding Plaintiff's mental abilities, Plaintiff states he is able pay attention all the time and follow written and spoken instructions, but denies socializing with others or being able to handle stress well. (R. 398-99).

## IV.    THE FIVE-STEP EVALUATION PROCESS

To be disabled under the Social Security Act, a claimant must meet the following criteria:

> An individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work…'[W]ork which exists in the national economy' means

work which exists in significant numbers either in the region where such individual lives or in several regions of the country.

42 U.S.C. § 423(d)(2)(A) (2006). The Social Security Administration uses the following five-step sequential evaluation process to determine if a claimant is disabled:

(i) At the first step, we consider your work activity, if any. If you are doing substantial gainful activity, we will find that you are not disabled.

(ii) At the second step, we consider the medical severity of your impairment(s). If you do not have a severe medically determinable physical or mental impairment that meets the duration requirement . . . or a combination of impairments that is severe and meets the duration requirement, we will find that you are not disabled.

(iii) At the third step, we also consider the medical severity of your impairments(s). If you have an impairment(s) that meets or equals one of our listings . . . and meets the duration requirement, we will find that you are disabled.

[Before the fourth step, the residual functioning capacity of the claimant is evaluated based "on all the relevant medical and other evidence in your case record . . ." 20 C.F.R. §§ 404.1520; 416.920 (2011).]

(iv) At the fourth step, we consider our assessment of your residual functional capacity and your past relevant work. If you can still do your past relevant work, we will find that you are not disabled.

(v) At the fifth and last step, we consider our assessment of your residual functional capacity and your age, education, and work experience to see if you can make an adjustment to other work. If you can make an adjustment to other work, we will find that you are not disabled. If you cannot make an adjustment to other work, we will find that you are disabled.

20 C.F.R. §§ 404.1520; 416.920 (2011). If the claimant is determined to be disabled or not disabled at one of the five steps, the process does not proceed to the next step. Id.

## V.    ADMINISTRATIVE LAW JUDGE'S DECISION

Utilizing the five-step sequential evaluation process described above, the ALJ made the following findings:

1.	The claimant meets the insured status requirements for a Period of Disability and Disability Insurance Benefits set forth in Section 216(i) of the Social Security Act so as to be insured for such benefits since October 17, 2011.

2.	The claimant has not engaged in substantial gainful activity since October 17, 2011, the alleged onset date (20 CFR 404.1571 *et seq.*, and 416.971 *et seq.*).

3.	The claimant has the following severe impairments: hypertension; obesity; diabetes mellitus with neuropathy; osteoarthritis/mild bilateral knee degenerative joint disease; asthma; gastroesophageal reflux disease; obstructive sleep apnea; history of carpal tunnel syndrome; cellulitis; depression; and anxiety (20 CFR 404.1520(c) and 416.920(c)).

4.	The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

5.	The undersigned finds that the claimant has the residual functional capacity to perform sedentary work as defined in 20 CFR 404.1567(a) and 416.967(a) that:  affords a sit/stand option with an opportunity to alternate between sitting and standing for up to 2 minutes every 15 minutes throughout an 8 hour work day without going off task; requires no bilateral foot control operation; requires no kneeling, crouching, crawling, or climbing of ladders, ropes, or scaffolds and no more than occasional balancing climbing ramps/stairs, or stooping; requires no more than occasional overhead reaching bilaterally; requires no more than frequent handling and fingering bilaterally; avoids concentrated exposure to extreme cold or heat, wetness, humidity, excessive vibration irritants, and chemicals; avoids all exposure to hazardous machinery, commercial driving, or unprotected heights; provides workstation location within 100 feet of restroom; requires no fast paced production requirements and few work place changes; and involves no more than occasional interaction with coworkers, supervisors, and the public.

6.	The claimant is unable to perform any past relevant work (20 CFR 404.1565 and 416.965).

7. The claimant was born on April 28, 1972, and was 39 years old, which is defined as a younger individual age 18-44, on the alleged disability onset date (20 CFR 404.1563 and 416.963).

8. The claimant has at least a high school education and is able to communicate in English (20CFR 404.1564 and 416.964).

9. Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569, 404.1569(a), 516.969, and 416.969(a)).

11. The claimant has not been under a disability, as defined in the Social Security Act, from October 17, 2011, through the date of this decision (20 CFR 404.1520(g) and 416.920(g)).

(R. 32-41).

## VI.    DISCUSSION

### A.    Standard of Review

In reviewing an administrative finding of no disability the scope of review is limited to determining whether "the findings of the Secretary are supported by substantial evidence and whether the correct law was applied." Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990). Substantial evidence is "such relevant evidence as a reasonable mind might accept to support a conclusion." Richardson v. Perales, 402 U.S. 389, 401 (1971) (quoting Consolidated Edison Co. v. NLRB, 305 U.S. 197, 229 (1938)). Elaborating on this definition, the Fourth Circuit has stated that substantial evidence "consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a jury verdict

were the case before a jury, then there is 'substantial evidence.'" <u>Shively v. Heckler</u>, 739 F.2d 987, 989 (4th Cir. 1984) (quoting <u>Laws v. Celebrezze</u>, 368 F.2d 640, 642 (4th Cir. 1968)). However, "it is not within the province of a reviewing court to determine the weight of the evidence, nor is it the court's function to substitute its judgment…if the decision is supported by substantial evidence." <u>Hays</u>, 907 F.2d at 1456 (citing <u>Laws</u>, 368 F.2d at 642; <u>Snyder v. Ribicoff</u>, 307 F.2d 518, 529 (4th Cir. 1962)). In reviewing the Commissioner's decision, the reviewing court must also consider whether the ALJ applied the proper standards of law: "[a] factual finding by the ALJ is not binding if it was reached by means of an improper standard or misapplication of the law." <u>Coffman v. Bowen</u>, 829 F.2d 514, 517 (4th Cir. 1987).

**B.    Contention of the Parties**

Plaintiff, in his Motion for Summary Judgment, asserts that the Commissioner's decision is based upon an error of law and "is not supported by substantial evidence." (Pl.'s Mot. at [1], ECF No. 22). Specifically, Plaintiff alleges that:

- The ALJ erred when he "impermissibly omitted severe impairments and minimized and fragmentized co-existing obesity-related impairments by finding that they were singly not severe."

- The ALJ's erred in his analysis of Plaintiff's credibility and RFC determination.

- The ALJ erred when he "ignored probative evidence of the photographs of Plaintiff's panniculus and large ventral hernia."

(Pl.'s Br. in Supp. of Mot. for Summ. J. ("Pl.'s Br.") at [10, 16,22], ECF No. 22-1)

Plaintiff asks the Court to reverse Defendant's final decision denying disability benefits, or in the alternative, remand the case to the Commissioner "for correction of errors and a new hearing."  ECF No. 22 at 1.

Defendant, in her Motion for Summary Judgment, asserts that the decision is "supported by substantial evidence and should be affirmed as a matter of law." (Def.'s Mot. at [1] ECF No. 23).  Specifically, Defendant alleges that:

- The ALJ appropriately considered Plaintiff's obesity throughout the sequential evaluation process.

- The RFC accounted for the limitations supported by the record.

(Def.'s Br. in Supp.  Of Def.'s Mot.  for Summ. J. ("Def.'s Br.") at [7,9], ECF No. 24).

## C.  Analysis of the Administrative Law Judge's Decision

### 1.  Consideration of Obesity

Plaintiff first contends that the ALJ's evaluation of Plaintiff's obesity was improper and inadequate when he failed to consider all obesity-related impairments in combination with the severity of Plaintiff's obesity.  (Pl's Br. at 11).  Specifically, Plaintiff notes that the ALJ recognized his severe and non-severe impairments, but argues the ALJ failed to find that some of Plaintiff's non-severe impairments are "obesity-related impairments that contribute to the impact of Plaintiff's obesity impairment.  Id.  at 12. Plaintiff further argues that the ALJ failed to mention other medically determinable impairments.  Id.

Social Security Ruling 02-1p provides guidance concerning the evaluation of obesity in disability determinations.  The rule provides:

[W]e will find that obesity is a "severe" impairment, when, alone or in combination with another medically determinable physical or mental impairment(s), it significantly limits an individual's physical or mental ability to do basic work activities.  .  .  We will also consider the effects of any symptoms (such as pain or fatigue) that could limit functioning.

The law further states,

There is no specific level of weight or BMI that equates with a "severe" or a "non-severe" impairment.  Neither do descriptive terms for levels of obesity (e.g., "severe," "extreme," or "morbid" obesity) establish whether obesity is or is not a "severe" impairment for disability program purposes. Rather, we will do an individualized assessment of the impact of obesity on an individual's functioning when deciding whether the impairment is severe.

.  .  .

Because there is no listing for obesity, we will find that an individual with obesity "meets" the requirements of a listing if he or she has another impairment that, by itself, meets the requirements of a listing.  We will also find that a listing is met if there is an impairment that in combination with obesity, meets the requirements of a listing.

.  .  .

We may also find that obesity, by itself, is medically equivalent to a listed impairment

.  .  .

We will also find equivalence if an individual has multiple impairments, including obesity, no one of which meets or equals the requirements of a listing, but the combination of impairments is equivalent in severity to a listed impairment.

. . .

However we will not make assumptions about the severity or functional effects of obesity combined with other impairments. Obesity in combination with another impairment may or may not increase the severity or functional limitations of the other impairment. We will evaluate each case based on the information in the case record.

. . .

An assessment should also be made of the effect obesity has upon the individual's ability to perform routine movement and necessary physical activity within the work environment.

. . .

As with any other impairment, we will explain how we reached our conclusions on whether obesity caused any physical or mental limitations.

. . .

When we identify obesity as a medically determinable impairment. . . , we will consider any functional limitations resulting from the obesity in the RFC assessment, in addition to any limitations resulting from any other physical or mental impairments that we identify.

SSR 02-1p.

As addressed above, the rulings require the ALJ to consider obesity when making his determinations at steps two, three, and four of the five-step sequential evaluation process. At step two, the ALJ determined Plaintiff has the following severe impairments: hypertension; obesity; diabetes mellitus with neuropathy; osteoarthritis/mild bilateral knee degenerative joint disease; asthma; gastroesophageal reflux disease; obstructive sleep apnea; history of carpal tunnel syndrome; cellulitis; depression; and anxiety. (R. 33). At step three, the ALJ determined Plaintiff does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments. Id. Plaintiff contends the ALJ failed to consider plaintiff's obesity in combination with his other impairments. Plaintiff primarily takes issue with the ALJ's non-severe impairment finding, in which the ALJ states,

> The undersigned has fully considered all of the foregoing conditions/symptoms and evidence indicative of any combined, related impact upon the claimant's level of functionality. However, no objective medical or other findings sufficiently establish any of those particular conditions or symptoms as having singularly or independently imposed any significant and persistent (i.e. over any 12 consecutive months) functional limitations since the alleged onset date."

(R. 33). Plaintiff contends that the second sentence indicates the ALJ viewed each impairment separately to determine that each one, individually, imposed restrictions, rather than considering them in combination with obesity. Had Plaintiff quoted the ALJ a sentence further, it would have exposed a clear contradiction of Plaintiff's claim—that

the impairments were not considered in combination: "Nonetheless, these impairments and symptoms have been considered in combination with the claimant's other impairments in reaching the residual functional capacity determination." (R. 33). Further still, the ALJ found "[t]he claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments." (R.33). The ALJ supported this finding by stating,

> The undersigned has considered the claimant's body size and its effect in causing or contributing to the claimant's other impairment. The claimant indicated that he is 5'11" and weighs 405 pounds which calculates to a Body Mass Index (BMI) of 56.5.[2] Under the Clinical Guidelines of the Identification, Evaluation, and Treatment of Overweight and Obese Adults established by the National Institutes of Health, the claimant is considered obese. The undersigned acknowledges that this body size may produce or contribute to symptoms of musculoskeletal pain and to general limit mobility and stamina (Social Security Ruling 02-1p); however, the record did not indicate any significant immobility or inability to ambulate effectively, or establish any end organ damage for chronic diseases commonly associated with obesity. Therefore, the undersigned does not find that the claimant's obesity, in combination with any other impairment, meets a listing.

Plaintiff's argument can only stand if it can be said that the ALJ failed to consider the combined impairments. The undersigned finds that this is not the case, as clearly and

---

[2] While Plaintiff reported his height as 5'11", elsewhere in the record his height was recorded to be 5'6". See also R. 747, 749. DR. Arturo Sabio measured him in stocking feet at 5'6-1/2". (R. 1118, 1190, 1121)

explicitly stated in the ALJ's own statements. The undersigned takes the ALJ at his word.

## 2. The ALJ's credibility analysis is supported by substantial evidence.

Next, Plaintiff contends the ALJ's credibility analysis was faulty. (Pl.'s Br. at 16). Specifically, Plaintiff asserts the ALJ erred at Step One of the credibility analysis by "failing to identify which of [Plaintiff's] alleged symptoms and limitations [ ] if accepted as credible would be disabling," and at Step Two made an improper finding on daily activities by using an improper legal standard. (Pl's Br. at 16, 20).

Under the regulations, "the determination of whether a person is disabled by pain or other symptoms is a two-step process." Craig v. Chater, 76 F.3d 585, 593–94 (4th Cir. 1996). First, the claimant must provide objective medical evidence showing "the existence of a medical impairment(s) which results from anatomical, physiological, or psychological abnormalities and which could reasonably be expected to produce the pain or other symptoms alleged." Id.; 20 C.F.R. §§ 416.929(b) & 404.1529(b). Second, "the intensity and persistence of the claimant's pain, and the extent to which it affects her ability to work, must be evaluated." Craig, 76 F.3d at 595; 404.1529(c)(1). The second step requires evaluating all the available evidence, including claimant's medical history, laboratory findings, and statements from the claimant and the claimant's treating and non-treating sources, as well as any other evidence relevant to the severity of the impairment, such as evidence of the claimant's daily activities, specific descriptions of the pain, and any medical treatment taken to alleviate it. Id. See 20 C.F.R. §§ 416.929(c)(3) & 404.1529(c)(3). When evaluating the claimant's statements, the ALJ should consider the consistency in the claimant's statements, medical evidence,

medical treatment history, and the ALJ's own observations of the claimant. See Social Security Ruling (SSR) 16-3p.

Step one of the pain analysis is focused solely on "establishing a determinable underlying impairment." Craig, 76 F.3d at 594. Thus for pain to be found to be disabling, the regulation requires a showing by objective evidence of the existence of a medical impairment which could reasonably be expected to produce the actual pain, in the amount and degree, alleged by the claimant. Id. After the claimant crosses this threshold, "the intensity and persistence of the claimant's pain, and the extent to which it affects her ability to work, must be evaluated. Id. at 595. In this case, the ALJ found Plaintiff's impairments could reasonably be expected to cause some of the alleged symptoms. The undersigned finds that it was proper for the ALJ to move on to step two upon making this determination.

Plaintiff contends that at step two the ALJ made an improper finding on Plaintiff's daily activities, asserting he used an improper legal standard and arguing that the daily activities cited by the ALJ are not inconsistent with a finding of disability.

Social Security Ruling 16-3p sets out several factors for an ALJ to use when assessing the credibility of a claimant's subjective symptoms and limitations, including:

1.  The individual's daily activities;

2.  The location, duration, frequency, and intensity of the individual's pain or other symptoms;

3.  Factors that precipitate and aggravate the symptoms;

4.  The type, dosage, effectiveness, and side effects of any medication the individual takes or has taken to alleviate pain or other symptoms;

5.  Treatment, other than medication, the individual receives or has

received for relief of pain or other symptoms;

6.    Any measures other than treatment the individual uses or has used
      to relieve pain or other symptoms (e.g., lying flat on his or her back,
      standing for [fifteen] to [twenty] minutes every hour, or sleeping on
      a board), and

7.    Any other factors concerning the individual's functional limitations
      and restrictions due to pain or other symptoms.

SSR 16-3p, (March 28, 2016). An ALJ need not document specific findings as to each factor. Wolfe v. Colvin, No. 3:14-CV-4, 2015 WL 401013, at *4 (N.D. W. Va. Jan. 28, 2015). However, the ALJ's decision "must contain specific reasons for the finding on credibility, supported by the evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight." SSR 16-3p, 1996 WL 374186 at *2. Because the ALJ has the opportunity to observe the demeanor of the claimant, the ALJ's observations concerning the claimant's credibility are given great weight. Shively, 739 F.2d at 989-90. This Court has determined that "[a]n ALJ's credibility determinations are 'virtually unreviewable' by this Court." Ryan v. Astrue, No. 5:09CV55, 2011 WL 541125, at *3 (N.D. W. Va. Feb. 8, 2011). If the ALJ meets his or her basic duty of explanation, then "an ALJ's credibility determination [will be reversed] only if the claimant can show [that] it was 'patently wrong.'" Sencindiver v. Astrue, No. 3:08-CV-178, 2010 WL 446174, at *33 (N.D. W. Va. Feb. 3, 2010) (quoting Powers v. Apfel, 207 F.3d 431, 435 (7th Cir. 2000)).

In the present case, the undersigned finds that the ALJ properly followed the two-step process when determining that Plaintiff is "not entirely credible." (R. 36). First, the ALJ determined that Plaintiff had proved that he suffers from severe medical

impairments capable of causing "some of the alleged symptoms (R. 35), including: "hypertension, obesity, diabetes mellitus with neuropathy, osteoarthritis/mild bilateral knee degenerative joint disease, gastroesophageal reflux disease, obstructive sleep apnea, history of carpal tunnel syndrome, cellulitis, depression, and anxiety." (R.33). The ALJ further considered Plaintiff's "urethral stricture, mitral valve disorder, tachycardia, sinusitis, back pain/mild degenerative changes of the lumbar spine, headaches, hyperlipidemia, hypothyroidism, bursitis of the hip, vitamin D deficiency, recent hernia, and osteoarthritis of the thumbs," although he determined that these impairments are not severe in nature. (R. 33). Second, the ALJ examined the factors outlined in SSR 16-3p when assessing the credibility of Plaintiff's subjective allegations in light of the entire record. (See R. 36-40).

The ALJ first considered Plaintiff's daily activities when making his credibility determination. The ALJ noted Plaintiff drives and drives his son to work, Plaintiff cares for and plays with pets, has the ability to perform personal hygiene tasks, occasionally cooks, shops in stores, handles bank accounts, socializes occasionally, attends church weekly, "runs around with his boys", and does some exercising. (R. 36).

Second, the ALJ considered the location, duration, frequency and intensity of Plaintiff's pain and other symptoms. Plaintiff alleges that he suffers from knee, back, shoulder, and hip pain. (R. 35). He has swelling in his knees, tenderness in his ankles and spine, and reduced range of motion due to obesity and osteoarthritis. (R. 37). The ALJ noted Plaintiff's thumb pain, difficulty with gripping, difficulty with breathing in heat and humidity, as well as Plaintiff's reports of chest pain and palpitations. (R. 35).

Third, the ALJ considered factors that precipitate and aggravate, Plaintiff's

symptoms, acknowledging Plaintiff stated he cannot stand for long periods and that he has difficulty breathing in heat and humidity. (R.35).

Fourth, the ALJ considered Plaintiff's pain and medications, noting Plaintiff treated his degenerative joint disease, arthritis, hip pain, hypertension and non-severe palpitations/tachycardia, asthma and obstructive sleep apnea with medications. (R. 37)

Fifth, the ALJ considered Plaintiff's treatment (aside from medication) for pain and symptom relief. In addition to medication, Plaintiff used a C-PAP machine to treat his asthma and obstructive sleep apnea and was prescribed splints for his hands. (R. 37).

Sixth, the ALJ considered Plaintiff's work history when assessing her credibility. (R. 37). He noted that Plaintiff returned to work after his alleged onset date and reported working fifty-five to sixty-five hours a week from December 2011 through June 2012, which he found undermined Plaintiff's credibility "as to the severity of his symptoms and his degree of limitation." (R. 36). The ALJ further found Plaintiff's medical evidence undermined his credibility as to the severity and duration of his symptoms, explaining that while Plaintiff has a history of "obesity, asthma, obstructive sleep apnea, diabetes mellitus, gastroesophageal reflux disease, carpal tunnel syndrome status post bilateral releases, and osteoarthritis of the knees, Plaintiff worked with these impairments in the past, and the record does not support any significant worsening since the alleged onset date." (R. 36).

Finally the ALJ considered Plaintiff's noncompliance, noting Plaintiff's diabetes mellitus is uncontrolled at times, and recognizing he has been noncompliant with his medication, yet with that noncompliance, the ALJ noted only "moderate" symptoms as a

result, further supporting his finding. (R. 36).

After a careful review of the ALJ's decision and the evidence of record, the undersigned finds that the ALJ's credibility determination is sufficiently specific to make clear his reasoning in finding Plaintiff not entirely credible. Thus, the burden was on Plaintiff to show that the ALJ's credibility determination is patently wrong. Plaintiff failed to meet this burden. Consequently, the undersigned accords the ALJ's credibility determination the great weight to which it is entitled.

### 3. The ALJ's RFC assessment is supported by substantial evidence.

Plaintiff alleges the ALJ's RFC determination is not supported by substantial evidence. Plaintiff maintains that "the lack of substantial evidence supporting the credibility determination also robs the ALJ's RFC finding of substantial evidence and invalidates the decision." (Pl's Br. at 21). However, Defendant argues substantial evidence supports the ALJ's RFC assessment including the weight given to the medical opinion evidence and his credibility determination. (Def. Br. at 10).

The ALJ must assess a claimant's residual function capacity (RFC) if the claimant's impairment is not sufficiently severe to equal or exceed a listed impairment. Mastro v. Apfel, 270 F.3d 171, 179 (4th Cir. 2001). Specifically, the RFC is used at steps four and five of the sequential evaluation process to determine whether an individual is able to do past relevant work or other work. SSR 96-8p.

In this case, The ALJ made the following RFC determination:

"[C]laimant has the residual functional capacity to perform sedentary work as defined in 20 CFR 404.1567(a) and 416.967(a) that: affords a sit/stand option with an opportunity to alternate between sitting and standing for up to 2 minutes every 15 minutes throughout an 8 hour work day without going off task; requires no bilateral foot control operation; requires no kneeling, crouching, crawling or climbing of ladders, ropes, or scaffolds and no more than occasional balancing, climbing ramps/stairs, or

stooping; requires no more than occasional overhead reaching bilaterally; requires no more than frequent handling and fingering bilaterally; avoids concentrated exposure to extreme cold or heat, wetness, humidity, excessive vibration, irritants, and chemicals; avoids all exposure to hazardous machinery, commercial driving, or unprotected heights; provides workstation location within 100 feet of restroom; requires no fast paced production requirements and few work place changes; and involves no more than occasional interaction with coworkers, supervisors, and the public.

(R. 35).

An individual's "RFC is the most [an individual] can still do despite [his] limitations." 20 C.F.R. §§ 404-1545(a), 416.945(a) 2016. SSR 96-8p outlines the criteria an ALJ should use when making an RFC determination, and provides that:

The RFC assessment must be based on all of the relevant evidence in the case record.

The RFC assessment must include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts (e.g., laboratory findings) and nonmedical evidence (e.g., daily activities, observations). In assessing RFC, the adjudicator must discuss the individual's ability to perform sustained work activities in an ordinary work setting on a regular and continuing basis (i.e., 8 hours a day, for 5 days a week, or an equivalent work schedule)[7], and describe the maximum amount of each work-related activity the individual can perform based on the evidence available in the case record. The adjudicator must also explain how any material inconsistencies or ambiguities in the evidence in the case record were considered and resolved.

SSR 96-8p

In this case, the ALJ provided a thorough discussion and analysis of the medical evidence and evidence in the record. As support for his opinion that Plaintiff could perform sedentary work with a sit/stand option with a number of postural limitations, the ALJ noted that Plaintiff's daily activities, medical evidence and other evidence, undermined Plaintiff's claim regarding the severity of his symptoms. Among several others, the ALJ noted a number of Plaintiff's impairments were controlled or resolved

with medication and /or treatment. (R. 36, 37). For other conditions, he noted that part of the record shows that Plaintiff was either noncompliant with medication (R. 36) or allowed extended periods to go by without treatment (R. 37), supportive of the ALJ's reasoning. The undersigned finds that the ALJ correctly applied the law in concluding that Plaintiff's reported daily activities and medical evidence undermined Plaintiff's subjective complaints. The ALJ properly based his RFC finding on Plaintiff's subjective complaints, the objective medical evidence, and the opinions of the medical providers.

### 4. The ALJ did not err when he did not comment on the photograph of Plaintiff's panniculus and ventral hernia.

In Plaintiff's final argument he asserts that the ALJ ignored probative evidence of the photographs of Plaintiff's panniculus and large ventral hernia. (Pl's Br. at 22).

An ALJ is required to *consider* all of the relevant medical evidence submitted by a claimant. 20 C.F.R. § 416.920; see also Reid v. Comm'r of Soc. Sec., 769 F.3d 861, 865 (4th Cir. 2014) (declaring that, if an ALJ states that the "whole record was considered, . . . absent evidence to the contrary, we take [him] at [his] word). However, an ALJ is "not obligated to *comment on* every piece of evidence presented." Pumphrey v. Comm'r of Soc. Sec., No. 3:14-CV-71, 2015 WL 3868354, at *3 (N.D. W. Va. June 23, 2015); Reid, 769 F.3d at 865 (stating that "there is no rigid requirement that the ALJ specifically refer to every piece of evidence in his decision"). Instead, an ALJ's decision need only "contain a statement of the case, in understandable language, setting forth a discussion of the evidence, and stating [his or her] determination and the reason or reasons upon which it is based." Reid, 769 F.3d at 865. In other words, an ALJ need only "provide a minimal level of analysis that enables [a] reviewing court[ ] to track the ALJ's reasoning." McIntire v. Colvin, No. 3:13-CV-143, 2015 WL 401007, at *5

(N.D. W. Va. Jan. 28, 2015).

This case amounts to a difference of opinion. The ALJ has established that he reviewed all of the evidence in accordance with the law. Plaintiff essentially disagrees with the ALJ's conclusion. The amount of weight an ALJ gives to one piece of evidence versus another is within the ALJ's discretion.

## VII.    RECOMMENDATION

For the reasons herein stated, I find that the Commissioner's decision denying the Plaintiff's application for Disability Insurance Benefits and Supplemental Security Income is supported by substantial evidence. Accordingly, I **RECOMMEND** that Plaintiff's Motion for Summary Judgment (ECF No. 22) be **DENIED**, Defendant's Motion for Summary Judgment (ECF No. 23) be **GRANTED**, and the decision of the Commissioner be affirmed and this case be **DISMISSED WITH PREJUDICE**.

Any party may, within fourteen (14) days after being served with a copy of this Report and Recommendation, file with the Clerk of the Court written objections identifying the portions of the Report and Recommendation to which objections are made, and the basis for such objections. A copy of such objections should also be submitted to the Honorable Gina M. Groh, Chief, United States District Judge. Failure to timely file objections to the Report and Recommendation set forth above will result in waiver of the right to appeal from a judgment of this Court based upon such Report and Recommendation. 28 U.S.C. § 636(b)(1); United States v. Schronce, 727 F.2d 91 (4th Cir. 1984), cert. denied, 467 U.S. 1208 (1984); Wright v. Collins, 766 F.2d 841 (4th Cir. 1985); Thomas v. Arn, 474 U.S. 140 (1985).

The Court directs the Clerk of the Court to provide a copy of this Report and Recommendation to all counsel of record, as provided in the Administrative Procedures for Electronic Case Filing in the United States District Court for the Northern District of West Virginia.

Respectfully submitted this November 30, 2016

MICHAEL JOHN ALOI
UNITED STATES MAGISTRATE JUDGE